10-573-cv
L-7 v. Old Navy

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: February 7, 2011    Decided: June 1, 2011)

Docket No. 10-573-cv

- - - - - - - - - - - - - - - - - - - - - - -x

L-7 DESIGNS, INC.,

<u>Plaintiff-Appellant</u>,

   - v.-                    10-573-cv

OLD NAVY, LLC,

<u>Defendant-Appellee</u>.

- - - - - - - - - - - - - - - - - - - - - - -x

Before:        DENNIS JACOBS, <u>Chief Judge</u>,
                      PETER W. HALL, <u>Circuit Judge</u>,
                      SHIRA A. SCHEINDLIN,[*] <u>District Judge</u>.

Plaintiff-Appellant L-7 Designs appeals from a judgment

on the pleadings of the United States District Court for the

Southern District of New York (Denny Chin, *Judge*), entered

---

[*] The Honorable Shira A. Scheindlin, of the United States District Court for the Southern District of New York, sitting by designation.

on January 21, 2010, dismissing five counts asserted in L-7's Complaint, each arising out of a Creative Services Agreement entered into between L-7 Designs and Defendant-Appellee Old Navy in September of 2007. We conclude that the District Court erred in dismissing two of those counts outright because L-7 plausibly alleged three bases for breach of contract for failure to negotiate in good faith (Count III) and wrongful termination (Count I). Accordingly, we affirm in part and vacate in part the District Court's judgment, and we remand for further proceedings; in so doing we reverse in part the order of the District Court that dismissed the Complaint and reinstate the Complaint to the extent provided in this Opinion.

FOR PLAINTIFF-APPELLANT: VIRGINIA R. RICHARD (Lori J. Van Auken on the briefs) Winston & Strawn LLP 200 Park Avenue New York, NY 10166

FOR DEFENDANT-APPELLEE: BRUCE P. KELLER (Shannon R. Selden on the brief) Debevoise & Plimpton LLP 919 3rd Avenue New York, NY 10022

SHIRA A. SCHEINDLIN, District Court Judge:

Plaintiff-Appellant L-7 Designs ("L-7") appeals from a judgment on the pleadings of the United States District Court for the Southern District of New York (Denny Chin, *Judge*), entered on January 21, 2010, dismissing five counts asserted in L-7's Complaint (the "Complaint" or "Compl."), each arising out of a Creative Services Agreement (the "Agreement") entered into between L-7 and Defendant-Appellee Old Navy ("Old Navy") in September of 2007. We conclude that the District Court erred in dismissing Count III against Old Navy for failure to negotiate in good faith an alleged agreement to develop and launch a TODD OLDHAM branded line of merchandise (the "Branded Line") to be sold exclusively in Old Navy stores. The District Court also erred in dismissing Count I for declaratory judgment that Old Navy wrongfully terminated the parties' Agreement under which L-7's principal, Todd Oldham, was to provide design services to Old Navy. Accordingly, we affirm in part and vacate in part the District Court's judgment, and we remand for further proceedings; in so doing we reverse in part the order of the District Court that dismissed the Complaint and reinstate the Complaint to the extent provided in this Opinion.

**BACKGROUND**[2]

## I. Materials Properly Considered on a Motion for Judgment on the Pleadings

One of the critical issues in this appeal is whether the District Court properly considered not only the Complaint, Old Navy's Answer, and the written documents attached to the Complaint in deciding Old Navy's Rule 12(c) motion, but also five email exhibits to Old Navy's *Counterclaims* – exhibits that were "attached" to Old Navy's Answer only by virtue of the fact that its Answer and Counterclaims were filed in the same document. L-7 argues the District Court improperly considered the exhibits without converting Old Navy's 12(c) motion to one for summary judgment, as required by Rule 12(d).

On a 12(c) motion, the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and

_____

[2] We set forth the pleadings in great detail to demonstrate the unusual amount of material the District Court had before it on this 12(c) motion.

documents that, although not incorporated by reference, are 'integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)). There is no question that the email exhibits were "attached" to Old Navy's Answer, even if they were only "part of" Old Navy's Counterclaims. See Fed. R. Civ. P. 10(c) ("a copy of a written instrument that is an exhibit to a pleading is a *part of* the pleading for all purposes") (emphasis added). Moreover, these emails – of which L-7 had notice well before Old Navy attached them to its Answer (because L-7 sent or received them) – were "integral" to the negotiation exchange that L-7 identified as the basis for its Complaint. See Sira, 380 F.3d at 67 (document not expressly cited in complaint was "incorporated into the pleading because [it] was integral to [plaintiff's] ability to pursue" his cause of action); Chambers, 282 F.3d at 153 (document "integral" to complaint where complaint "relie[d] heavily upon its terms and effect") (quotation marks omitted); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (necessity of translating motion into one under Rule 56 "largely dissipated" where plaintiff had "actual notice" of information in documents and "relied upon [them] in framing

5

the complaint"). "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim – and that they apparently most wanted to avoid – may not serve as a means of forestalling the district court's decision on [a 12(b)(6)] motion." Cortec, 949 F.2d at 44. For these reasons, in reviewing de novo Old Navy's motion for judgment on the pleadings, we draw all facts – which we assume to be true unless contradicted by more specific allegations or documentary evidence – from the Complaint and from the exhibits attached thereto,[3] and we also consider the emails attached to Old Navy's Counterclaims. See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 222 (2d Cir. 2004) (discrediting allegation "belied" by letters attached to the complaint); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995) ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint."). The facts thus derived, viewed in the light most favorable to L-7, are as follows.

---

[3] All exhibits cited herein are exhibits to the Complaint unless otherwise noted.

## II.  The Parties

L-7's principal, Todd Oldham, is a world famous artist, fashion and graphic designer, photographer, writer, and television personality.  He formed L-7 in 1989 to manage his design services and intellectual property rights, including eight U.S. federal registrations for the mark TODD OLDHAM.  "[A] luminary in the fashion and design industry for over twenty years," Oldham is "considered one of the most important designers of fashion and home furnishings working today" and "the singular talent behind the internationally famous TODD OLDHAM brand."  Compl. ¶ 8.  For more than a decade, Oldham and L-7 have collaborated on a variety of TODD OLDHAM branded merchandise.[4]

Old Navy, a subsidiary of Gap Inc., operates a chain of retail apparel stores, with more than a thousand stores throughout the United States and Canada.  For at least the last five years, Old Navy has been suffering declining sales.  One of its strategies for increasing sales has been to increase its appeal to younger consumers.

---

[4]  For example, Oldham entered into a licensing agreement with Mattel, Inc. for a special collector's edition of a Barbie doll.

7

## III.  The Agreement

In the spring of 2007, L-7 approached Old Navy to discuss the possibility of entering into a relationship with L-7, and Old Navy, "enthusiastic about this possibility," ultimately requested that Oldham become the company's new Design Creative Director.  Id. ¶ 26.  In order to induce Oldham to join Old Navy's design team, Old Navy proposed to introduce a TODD OLDHAM branded line of clothing, and to pay royalties to L-7 in the form of five percent of the Branded Line's sales.  Faced with continuing declining sales, Old Navy pushed Oldham to enter into an agreement quickly so that it could publicly announce both Oldham's appointment as Old Navy's Design Creative Director and also the launching of the Branded Line.

On September 21, 2007, the parties entered into the Agreement,[5] under which L-7 was to perform certain "Services" and provide certain "Deliverables," as set forth in a "Scope of Work" (the "SOW") attached to the Agreement. Agreement § 1.  Under the SOW, Oldham would provide design services for Old Navy for three years in exchange for an annual "fee" of $2 million; in addition, Oldham would

---

[5]     By its terms, the Agreement is governed by New York law.

8

receive a guaranteed bonus of $0.5 million in year one and, in years two and three, 1.25 percent of the year's incremental sales (not to exceed $6 million).  SOW §§ 1, 2. Section 5 provided that during the term of the Agreement, "either party may terminate this Agreement, effective immediately upon notice thereof, in the event of a material breach of this Agreement that remains uncured after thirty (30) days written notice of the breach to the other party."

## IV.  The Licensing Agreement

Section 5 of the SOW, entitled "Todd Oldham Branded Line," provided as follows:

> a. In September 2007, the parties will announce publicly that Todd Oldham/[L-7] shall be serving as Design Creative Director of Old Navy and that it is the intent of the parties to develop and launch a line of products that will bear TODD OLDHAM Marks to be sold exclusively at Old Navy stores at a future time.
>
> b. [L-7] and Old Navy acknowledge and agree that the specific terms and conditions related to this proposed line of products bearing TODD OLDHAM Marks are to be negotiated and agreed upon by the parties in a separate agreement. The parties plan to enter into a separate agreement related to these products by October 1, 2008.
>
> c. The parties agree that this separate agreement will contain at least the following: (1) royalty fees paid to [L-7] of 5% of Old Navy's retail sales for this particular line only (not all Old Navy products) and (2) agreement and final approval by both Old Navy

9

and [L-7] as to the collections and products to be sold by Old Navy.

On September 21, 2007, Old Navy announced via a press release that it intended to launch the Branded Line. On October 3, 2007, Monika Fahlbusch (the Old Navy executive assigned to the Branded Line) emailed Vital Vayness (L-7's representative) to "recommend we plan to begin [discussion on the license agreement for the Branded Line] in our new fiscal year – say in April? We have until October so there is no rush . . . ." Ex. 19. Thereafter, L-7 and Oldham performed their obligations under the Agreement, and Old Navy executives publicly and privately praised Oldham's performance as Design Creative Director.

**V. April-October 2008 Negotiations**

On April 2, 2008, L-7 (Vayness) "initiated negotiations to finalize" the licensing agreement for the Branded Line by emailing Fahlbusch (Old Navy) L-7's standard form license agreement and a term sheet that outlined a three-year initial term and annual guaranteed minimum royalties (the "April Proposal"). Compl. ¶ 44. The email suggested that Old Navy "formulate [its] initial thoughts, needs and objectives" and then "present to [Oldham] in [M]ay" while

Fahlbusch (Old Navy), Vayness (L-7), and Old Navy's attorney "begin work on the language of the contract." Ex. 17.

Commencing in May 2008, Old Navy made "material representations" that were "false, as [L-7] subsequently learned." Compl. ¶ 47; accord Ex. 19. For example in May of 2008, Fahlbusch (Old Navy) assured Vayness (L-7) that she was "already working with our legal team on the licensing agreement template." Ex. 19. But throughout the late spring and summer of 2008, L-7 repeatedly followed up with Fahlbusch and Old Navy's Executive Vice President, Douglas Howe, seeking feedback on the April Proposal and on a "redirection" Old Navy was taking in its "approach," with little or no followup. Exs. 19-20. During one meeting in June of 2008 at which Oldham (L-7), Howe (Old Navy), and Tom Wyatt (another Old Navy executive) were present, Old Navy proposed postponing discussions of the Branded Line. Nevertheless, on June 12, 2008, Vayness (L-7) indicated to Fahlbusch (Old Navy) that "things are proceeding in the right direction with the branded line." Ex. 19.

In a late July 2008 email, Fahlbusch (Old Navy) suggested that the reason for Old Navy's delay in getting back to L-7 was that "next steps" on the Branded Line license would be "impacted by who is named President." Id.

Vayness (L-7) responded the same day, reminding Fahlbusch (Old Navy) that "we have a provision in the contract calling for the license agreement to be entered into by October 1st." Id.

On September 2, 2008, Vayness (L-7) emailed Fahlbusch (Old Navy) seeking Old Navy's feedback on the terms set forth in L-7's April 2008 email, indicating that L-7 was "ready to discuss [11 points] as early as possible." Ex. 20. L-7 followed up with emails and telephone calls to Fahlbusch (Old Navy) on September 7, 9, and 10, 2008. On September 10, 2008, Fahlbusch (Old Navy) recommended that Oldham start working "directly" with Howe "as it seems we all have a different understanding of the numerous conversations in recent months related to the branded line." Id.

On September 30, 2008, Wyatt (Old Navy) advised L-7 in a telephone call for the first time that Old Navy wished to postpone the signing of a license for the Branded Line "'indefinitely.'" Compl. ¶ 52 (quoting Wyatt).[6] In

---

[6] The Complaint alleges that Howe, Old Navy's then-executive vice president, expressed this to L-7. See Compl. ¶ 52. An October 7, 2008 email from Vayness (L-7) to Wyatt, however, indicates that Wyatt made the statement. See Ex. 23.

12

response, L-7 stated that it expected Old Navy to provide it with definitive dates to restart negotiations, enter into the licensing agreement, and launch the Branded Line, and compensation for the postponement of the initial October 1, 2008 signing date.  Old Navy failed to provide a response within a week as promised.

**VI.  Fall 2008 Notice of Breach and Demand for Damages**

On October 7, 2008, L-7 advised Old Navy's in-house counsel that Old Navy was in material breach of the Agreement for failing to negotiate in good faith.  See Ex. 23.  Counsel for Old Navy responded a week later, stating Old Navy's view that the Agreement "does not obligate Old Navy to enter into a separate license agreement for Todd Oldham branded products" and that although Old Navy did not "foreclose the possibility of engaging in discussions about Todd Oldham branded products in the future if business conditions permit, [Old Navy is] not currently in a position to make a commitment to any such future discussions."  Ex. 24.  The next day, Wyatt, then President of Old Navy, told Oldham that Old Navy was "'very, very sorry' but because of economic conditions, Old Navy could not follow through with the promised license for a TODD OLDHAM branded line of

13

apparel to be carried exclusively in Old Navy stores."
Compl. ¶ 55.

After waiting thirty days from Old Navy's receipt of L-7's October 7th notice of breach, outside counsel for L-7 sent a letter to Old Navy requesting that Old Navy remedy the damage to L-7 caused by Old Navy's breach by (1) compensating L-7 for lost royalties and reputational damages (estimated at $75 million) and (2) paying Oldham his expected fees for the second and third years of the Agreement ($4 million).

### VII. Old Navy's December 2008 Response

On December 3, 2008, counsel for Old Navy responded, denying that Old Navy was obligated to enter into a license agreement or had failed to negotiate in good faith. Counsel for Old Navy explained that, in the course of their negotiations,

> differences emerged in the parties' positions, including on such essential issues as the types of products to be included in the line, how many stores would be included in a launch, the staffing necessary to support such a line, and, most importantly, the timing of any such launch.

Ex. 26. According to Old Navy's counsel, "business circumstances made an extensive launch in the immediate near term unfeasible." Id. Thereafter, from December 15, 2008

14

to February 6, 2009, Old Navy engaged in "sham negotiations," falsely representing that it fully intended to enter into a license agreement.  Compl. ¶ 124.

**VIII.   The Old Navy January 2009 Proposal**

The parties met once in December 2008 and several times in January 2009 to "work out the details of the license agreement," a further draft of which L-7 supplied to Old Navy on December 15, 2008.  Compl. ¶ 60.  On January 8, 2009, one hour before a scheduled conference call, Old Navy proposed a launch at 100 Old Navy stores ("As you know, our history of presenting third party-branded product in our stores is relatively short . . ."); a one-year commitment beginning in the spring of 2010; no additional personnel resources; and a one-year projected royalty of $1.5 million (". . . our previous discussions have never contemplated any royalty minimum guarantees, and, as a general rule, our company has not and will not agree to minimum guarantees.  This has been consistent in all of our recent agreements.") (the "January Proposal").  Ex. 27.

**IX.   January 2009 Discussions[7]**

---

[7]     L-7's Complaint and exhibits attached thereto largely omit reference to the parties' January 2009 discussions.  The "facts" set forth below are primarily drawn from the five email exhibits to Old Navy's

15

Oldham responded immediately by email to Old Navy's January Proposal:

> [Your projections] seem EXTREMELY uncommitted to me. This feels like an effort to absolve old navy's contractual responsibilities and not a commitment to build a new brand that was made to me when i joined and what you reiterated to me last month. 100 stores will not work. the 1 million in launch dollars will not be effective. the one year commitment is too brief as there are so many hiccups in launching a brand . . . . i hope that we can get this resolved but we are very far away from a reasonable plan. the volume of work necessary to bring a project of this scale to bloom is at great odds with your financial projections.

Counterclaims Ex. A. In the discussions that followed, L-7 asked for a minimum guarantee of $37.5 million for a three-year term and then reduced the request to $20 million for a two-year term. On January 16, 2009, L-7 inquired of Old Navy whether it had "made any changes to any of its positions as stated [in the January Proposal]." Id. Ex. E. Old Navy responded the next day:

> To date, we have not been presented with any comprehensive counteroffer and instead there has been a [sic] insistence on large guaranteed minimum payments that we have explained are unacceptable and inconsistent with our business plans and practices . . . .

Counterclaims.

Id. Ex. D.  Additional emails were exchanged, and on January 29, 2009, the parties held a conference call, during which they agreed to talk again after speaking with their respective "principals."  Ex. 28.  The same day, L-7 emailed Old Navy a "revised proposal" reflecting Oldham's input on the points discussed during the call.  Id.

**X.  February 2009 Communications**

Four days later, on February 2, 2009, Old Navy responded to L-7's January 29th email, advising L-7 that "despite our best efforts to negotiate an agreement that would be reasonable and mutually acceptable, we have not reached and will not be able to reach common ground on key business terms," reiterating that minimum guaranteed payments were "inconsistent with our business plans and practices."  Id.  Vayness (L-7) responded the same day, explaining his "surprise" at Old Navy's email given that the January 29, 2009 call was "completely amicable, polite, professional, and [] friendly" and that none of the points discussed during that call "was left off as a deal breaker."  Id.  The email went on to list items as to which L-7 contended there was agreement ("number of stores," "products," "timeline and term," "marketing," "royalty rate," and "territory"); items that it was "now prepared" to

accept, including no minimum guaranteed royalties; two points that needed clarification ("personnel" and "development budget"); and one issue "to be agreed to," namely ownership of "designs."[8]  Id.  On February 6, 2009, Old Navy advised L-7 that material "open issues" remained, and that, in light of the nature of the negotiations, Old Navy did not believe that a "collaborative partnership" could be established.  Compl. ¶ 62.

**XI.  Old Navy's Termination of the Agreement**

On February 18, 2009, L-7 commenced this lawsuit against Old Navy, filing under seal a complaint alleging breach of contract, breach of the implied duty of good faith and fair dealing, and fraud.  Two days later, on February 20, 2009, counsel for Old Navy sent L-7 a letter terminating the Agreement ("Termination Letter") on the grounds that L-7 had

> materially breached the [Agreement] by filing a lawsuit against Old Navy, by failing to provide meaningful input on design processes and procedures, by failing to participate meaningfully in meetings with the Old Navy

---

[8]  Citing this email, L-7 alleges in the Complaint that "[o]n February 2, 2009, L-7 . . . accepted Old Navy's January 8, 2009 proposal in its entirety."  Compl. ¶ 61.  As the text of the email makes clear, however, this was not quite so.

18

creative team and by otherwise failing to perform its obligations under the [Agreement].

Ex. 29. Old Navy did not provide L-7 with an opportunity to cure its alleged breaches. Prior to the February 20th Termination Letter, Old Navy had voiced no complaints about Oldham's performance under the Agreement; instead, he was continuously praised.

**PROCEDURAL HISTORY**

L-7 filed its first complaint in the District Court on February 18, 2009, under seal. On April 17, 2009, L-7 filed under seal the amended Complaint at issue in this appeal, adding claims for (I) wrongful termination and (II) trade disparagement to its claims for (III) breach of contract, (IV) breach of the implied covenant of good faith and fair dealing, and (V) fraud. Old Navy filed its Answer and Counterclaims on May 1, 2009, and L-7 filed a Reply on May 8, 2009. Old Navy's motion for judgment on the pleadings was fully submitted on August 21, 2009. On September 9, 2009, the District Court stayed depositions and ruled that "a new discovery cut-off will be set after the pending [Rule 12(c)] motion is decided." Special Appendix to L-7 Appellate Brief ("L-7 App. Brief") at 66. In an opinion

19

dated January 19, 2010, it granted Old Navy's motion, dismissing L-7's Complaint with prejudice. It issued a slightly amended opinion on January 21, 2010. L-7 moved to amend the judgment and replead two weeks later. The District Court denied L-7's motion in an opinion dated February 16, 2010.

## I. Motion for Judgment on the Pleadings

### A. Count III: Breach of Contract for Failure to Negotiate in Good Faith

The District Court first dismissed L-7's claim for breach of contract for Old Navy's failure to enter into the licensing agreement.[9] It nonetheless concluded that Section 5 of the SOW "undoubtedly did create [an] obligation on the part of the parties to negotiate a license agreement in good faith," L-7 Designs, Inc. v. Old Navy, LLC, No. 09 Civ. 1432, 2010 WL 157494, at *8 (S.D.N.Y. Jan. 19, 2010). However, it found that the "record" of the "detailed documentation of the negotiations between Old Navy and L-7 over the anticipated license agreement," combined with the detailed allegations of the Complaint, "show, unequivocally, that L-7's claim that Old Navy failed to negotiate in good

---

[9] We affirm this portion of the District Court's dismissal of Count III.

20

faith is not plausible." Id. *First*, based on the fact that "the parties exchanged numerous telephone calls and emails and, as L-7 acknowledged, progress in the negotiations was made," it concluded that Old Navy "negotiated for some ten months." Id. Although "the parties seemed to reach an impasse and negotiations broke down" in the fall of 2008, "the parties resumed talks and met several times in December 2008 and January 2009" before L-7 rejected Old Navy's January Proposal. Id.

*Second*, the District Court concluded that because "L-7 was making extraordinarily high demands," it was "not surprising that Old Navy resisted these demands," noting that at the agreed-upon five percent royalty rate "some $200 million in sales of Todd Oldham branded products would had to have been generated in one year to generate" even the reduced royalty request proposed by L-7 ($20 million over two years). Id.

*Third*, L-7's only non-conclusory, specific "allegation" was "its assertion that Old Navy decided to 'renege' on its own January 8, 2009, proposal, and that this decision 'is itself damning evidence of [Old Navy's] bad faith.'" Id. at *9 (quoting L-7's Memorandum of Law in Opposition to Old Navy's Motion for Judgment on the Pleadings ("L-7 12(c)

21

Opp.") at 23).  But, the District Court concluded, the emails attached to Old Navy's Counterclaims rendered this assertion "not plausible" because they showed that "L-7's purported acceptance of the January 8th proposal on February 2, 2009, clearly was not [] an acceptance of the proposal 'in its entirety.'"  Id. (quoting Compl. ¶ 61).

*Fourth*, because "insisting on 'terms to the point of impasse' [is] not sufficient to show bad faith," L-7 could not argue that "Old Navy's refusal to agree to a minimum guarantee [was] evidence of bad faith."  Id. (citing Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 279 (7th Cir. 1996)).[10]

### B.  Count I: Wrongful Termination

The District Court also dismissed Count I – a request for declaratory judgment (1) that Old Navy failed to provide (i) written notice of its claims of breach or (ii) 30 days' opportunity to cure any claimed breach; (2) that the Termination Letter did not effect a termination of the

---

[10]  The District Court then concluded that, because Count IV (breach of the implied duty of good faith and fair dealing) was "essentially identical" to Count III "as both are based on the allegation that Old Navy failed to negotiate a license agreement in good faith," Count IV failed to state a claim "[f]or the [same] reasons."  2010 WL 157494, at *9.

Agreement; and (3) that Old Navy wrongfully terminated the Agreement in retaliation for L-7's lawsuit against it. The District Court offered three reasons why "the claim fails as a matter of law," 2010 WL 157494, at *9. *First*, "Old Navy did provide written notice of termination." Id. at *10 (citing the Termination Letter). *Second*, while acknowledging Old Navy's admission that it failed to provide a 30-day cure period, the District Court found that it was relieved of this obligation because, for two reasons, notice of cure would have been futile. Initially, the District Court reasoned, "[i]t is difficult to imagine that Oldham could perform [his] duties after he sued Old Navy." Id. (citing Allbrand Discount Liquors, Inc. v. Times Square Stores Corp., 399 N.Y.S.2d 700, 701 (2d Dep't 1977), for the proposition that "when one party 'will not live up to the contract, the aggrieved party is relieved from the performance of futile acts'"). In particular,

> Oldham could not very well continue to help Old Navy creatively, including with respect to public relations matters, while pursuing a lawsuit against Old Navy. ([Agreement] § 1). Among other things, Oldham was supposed to, under the [Agreement], "[m]otivate, inspire, coach, and share vision, insight and passion with Old Navy's creative team," and he was supposed to "[p]rovide input" to Old Navy's president and leadership team. ( Id.).

23

*Id.* Notice of breach would also have been futile, the District Court reasoned, because "[e]ven a withdrawal of the complaint – and it is highly unlikely that L-7 would have withdrawn the complaint if Old Navy had sent L-7 a notice to cure – would not have undone the harm caused by the public filing of a lawsuit against Old Navy." *Id.* *Third*, Count I failed because "even assuming the failure to give a cure period was a breach, in the context here it surely was not a material one." *Id.*

After then dismissing Counts II and V of the Complaint for trade disparagement and fraud, the District Court granted Old Navy's motion for judgment on the pleadings and dismissed L-7's claims with prejudice. Judgment was entered in favor of Old Navy on January 21, 2010.

## II. Motion to Amend and Replead

L-7 filed a motion to amend the judgment and replead on February 5, 2010 "based on information contained in documents produced by Old Navy following the close of briefing" on the Rule 12(c) motion. L-7 Motion to Amend and Replead at 1. The District Court denied the motion, reasoning that L-7 had already had "two bites at the apple, as it has already filed two complaints"; "the request is untimely, as L-7 has had the documents for months" yet

24

"never indicated a desire to amend its amended complaint prior to the granting of the motion for judgment on the pleadings"; and, because "the additional documents L-7 now seeks to rely on" would not change the District Court's conclusions, "the proposed amendment therefore would be futile."  L-7 Designs, Inc. v. Old Navy, LLC, No. 09 Civ. 1432, 2010 WL 532160, at *2 (S.D.N.Y. Feb. 16, 2010).  L-7 filed a timely notice of appeal on February 17, 2010.

## DISCUSSION

### I.  Motion for Judgment on the Pleadings

#### A. Standard of Review

We review de novo a district court's decision to grant a motion for judgment on the pleadings pursuant to Rule 12(c).  See Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010).  In deciding a Rule 12(c) motion, we "employ[] the same . . . standard applicable to dismissals pursuant to [Rule] 12(b)(6).  Thus, we will accept all factual allegations in the [C]omplaint as true and draw all reasonable inferences in [Plaintiff's] favor."  Johnson v.

_Rowley_, 569 F.3d 40, 43 (2d Cir. 2009) (quotation marks and citation omitted).[11]

In _Ashcroft v. Iqbal_, the Supreme Court set forth a "two-pronged approach" to evaluate the sufficiency of a complaint. 129 S. Ct. at 1949-50. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." _Harris v. Mills_, 572 F.3d 66, 72 (2d Cir. 2009) (quotation marks and alterations omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will . . . be a

---

[11] We note that, as plaintiffs carefully heed the admonition to support "legal conclusions" with factual allegations – lest they be deemed "conclusory" and therefore denied a presumption of truthfulness, _Ashcroft v. Iqbal_, 129 S. Ct. 1937, 1950 (2009) – trial judges, and appellate judges who review their determinations, are constantly faced with the task of evaluating competing inferences to be drawn _from_ those facts. In this sense, _Iqbal_ and _Bell Atlantic Corp. v. Twombly_, 550 U.S. 544, 586 (2007), have rendered even more important (and more difficult) both trial judges' adherence to the most fundamental pleading principles – namely, accepting as true all factual allegations and drawing all reasonable inferences from those facts in plaintiffs' favor – and appellate judges' subsequent de novo review of the decisions of the district courts.

26

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quotation marks and alteration omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949 (quotation marks omitted). Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable. See id. at 1947-52.

## B. Counts II, IV, and V

We affirm the District Court's dismissal of the trade disparagement and common law fraud claims substantially for the reasons articulated by the District Court. We also affirm dismissal of the claim for breach of the implied duty of good faith and fair dealing, but for a different reason. See infra note 18.

## C. Count III: Breach of Contract for Failure to Negotiate in Good Faith

### 1. Applicable Law

27

Under New York law parties who enter into binding preliminary agreements, such as Section 5 of the SOW, "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement . . . ." Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987). These agreements do not commit the parties to reach their ultimate contractual objective; instead, such agreements create an "obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998) (quotation marks omitted). This obligation bars a party from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." Tribune, 670 F. Supp. at 498.

"In effect, an agreement to agree buys a party an assurance that the transaction will falter only over a genuine disagreement, thus allowing a party strapped for time or money to go ahead with arrangements with a sufficient degree of confidence in the outcome." P.A. Bergner & Co. v. Martinez, 823 F. Supp. 151, 156 (S.D.N.Y. 1993); see also Penguin Grp. (USA) Inc. v. Steinbeck, No. 06

28

CV 2438, 2009 WL 857466, at *2 (S.D.N.Y. Mar. 31, 2009) ("The linchpin of negotiation is not that one side capitulates to the other, but that there is a good faith, honest, articulation of interests, positions, or understandings."); Venture Assocs. Corp., 96 F.3d at 278 ("The parties may want assurance that their investments in time and money and effort will not be wiped out by the other party's foot-dragging or change of heart or taking advantage of a vulnerable position created in the negotiation."). "[T]he parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing." Adjustrite, 145 F.3d at 548.

To state a claim for breach of contract for failure to negotiate in good faith, a plaintiff must "allege the specific instances or acts that amounted to the breach"; "generalized allegations and grievances" will not suffice to survive a motion for judgment on the pleadings. U.S. ex rel. Smith v. New York Presbyterian Hosp., No. 06 Civ. 4056, 2007 WL 2142312, at *16 (S.D.N.Y. July 18, 2007); accord Prospect St. Ventures I, LLC v. Eclipsys Solutions Corp., 804 N.Y.S.2d 301, 302 (1st Dep't 2005).

29

Although lost profits are not available where no agreement is reached, see Goodstein Constr. Corp. v. City of New York, 80 N.Y.2d 366, 374 (1992), out-of-pocket costs incurred in the course of good faith partial performance are appropriate, see Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 74 n.2 (2d Cir. 1989).

## 2. Application

L-7 stated a plausible claim that Old Navy breached its obligation to negotiate the license agreement in good faith. The three bases alleged for this claim were that Old Navy (1) "failed to participate in negotiations from April 2008 to December 15, 2008 and never provided a single substantive comment with respect to the draft license at any time in 2008," L-7 12(c) Opp. at 5;[12] (2) made "repeated material representations that it would negotiate the terms of the license agreement in good faith," which L-7 subsequently learned were "false," Compl. ¶ 47; and (3) "proposed terms it knew to be in bad faith and economically unfair to [L-7], believing they would be rejected, and then reneged when [L-7] did accept," L-7 12(c) Opp. at 23. These are legally

---

[12] See also L-7 12(c) Opp. at 23 (Old Navy "fail[ed] to engage [L-7] in negotiations on the licence with [L-7] for more than one year.").

cognizable theories for breach of the duty to negotiate in good faith. Moreover, drawing all reasonable inferences in L-7's favor, the non-conclusory allegations in L-7's Complaint, combined with the exhibits attached thereto, render each one plausible.[13]

*First*, L-7 plausibly alleged that Old Navy – who in June of 2008 proposed postponing negotiations – was engaged in dilatory tactics from April 2008 until December 15, 2008, during which time it failed to provide any substantive comments on L-7's draft license agreement. The emails exchanged between Vayness (L-7) and Fahlbusch (Old Navy) from April 2008 until September 10, 2008 – when Fahlbusch finally "recommend[ed]" that Vayness and Oldham work "directly with [Howe] in terms of the branded line," Ex. 21 – support the plausible inference that Fahlbusch was repeatedly putting L-7 off for undisclosed or pretextual

---

[13]    Citing Adjustrite, 145 F.3d at 548, Defendant argues that the District Court could find, as a matter of law based on Old Navy's proposal of terms "consistent with" Section 5 of the SOW, that it negotiated in good faith. However, the only term specified in the September 2007 agreement with which Old Navy's proposal could have "conform[ed]" was the five percent royalty fee. That the January Proposal included this royalty provision does not establish as a legal matter that it acted in good faith, especially in light of L-7's well-pled allegations that the January negotiations were designed to induce L-7's rejection.

reasons (discussed further below). The mere exchange of telephone calls and emails – most of which were initiated by L-7 (according to L-7's exhibits) and some of which Old Navy did not respond to (according to L-7's uncontradicted allegations) – does not make the inference that "Old Navy negotiated for some ten months," 2010 WL 157494, at *8, so obvious that L-7's opposing inference of dilatory tactics is rendered implausible.[14]

Similarly, whether or not L-7 agreed to Old Navy's alleged request to postpone discussions in June of 2008 – a question of fact left open by the pleadings[15] – that would

_____

[14] Nor is the inference that "progress in the negotiations was made," 2010 WL 157494, at *8, so obvious from L-7's June 12th email that "things are proceeding in the right direction with the branded line" that L-7's reasonable, opposing inference must be discredited. Drawing all reasonable inferences in L-7's favor, and taking into account its allegations that Old Navy was stalling, the June 12th email suggests that L-7, frustrated with Old Navy's non-responsiveness, was politely encouraging Old Navy to entertain L-7's proposals, while communicating its view that the parties still had a long way to go.

[15] In the "Facts" section of its opinion, the District Court stated that "Old Navy wanted to postpone the launch [of the Branded Line] and L-7 was prepared to do so, from October 1, 2008, to February 1, 2009." 2010 WL 157494, at *2. However, in making this factual determination, it cited a *draft* email from Vayness (L-7) to Howe (Old Navy) on Oldham's behalf. See Ex. 22 (entitled "2nd draft e mail to [Howe]"). The email Vayness (L-7) actually sent states only his "underst[anding]" that Howe "*thought* that [Oldham] had agreed to postpone the finalizing of an agreement." Id.

32

not defeat L-7's allegations that Old Navy was engaged in dilatory tactics. "[A]ssuming the pleaded facts to be true and read[ing those facts] in [L-7's] favor," Sepúlveda-Villarini v. Dep't of Educ. of Puerto Rico, 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J.), it suggests the converse – that *L-7*, eager to execute the licensing agreement on terms as favorable to it as possible, and trusting that its negotiating partner in good faith believed a postponement of discussions would be mutually advantageous, was negotiating in good faith. It is reasonable to infer that, once L-7 became suspicious of what it believed to be dilatory tactics on Old Navy's part, it took a firmer stance, clarifying that while Old Navy may have "thought that [Oldham] agreed to postpone the finalizing of an agreement," the "idea of postponing immediate discussions" was merely "discussed," and that the parties should work to ensure that the Agreement did not "become breached," Ex. 22.

---

(emphasis added). The draft email written by Oldham's representative about a June meeting for which he (the representative) was not present and where "the idea of postponing the discussion . . . was discussed" does not establish, at the motion for judgment on the pleadings stage, that "L-7 was prepared" to postpone the launch of the Branded Line by four months, 2010 WL 157494, at *2.

33

*Second*, L-7 plausibly alleged that, commencing in May 2008, Old Navy made repeated material representations that L-7 subsequently learned were false, such as Fahlbusch's (Old Navy's) assurances to Oldham that she was already working with Old Navy's legal team on the licensing agreement template, or her multiple promises to get back to L-7, which either never happened or only occurred after substantial delay.[16]  L-7's Complaint also suggests that, instead of revealing "its true purpose, *which was to avoid entering into the license agreement* as required under the [Agreement]," Compl. ¶ 121 (emphasis added), Old Navy advanced pretextual reasons for its decision to delay negotiations (economic conditions) and, ultimately, to cut off negotiations (L-7's insistence on minimum guaranteed royalties).  See Teachers Ins. & Annunity Assoc. of Am. v. Butler, 626 F. Supp. 1229, 1233-34 (S.D.N.Y. 1986) (upholding a finding of bad faith, after a six-day non-jury trial, where evidence suggested that defendant "deliberately intended" not to close on an agreement that was no longer

_____

[16]  A *reasonable inference* to draw from Old Navy's lack of communication and failure to supply counter-proposals or comments – on a draft license agreement that Old Navy's legal team was supposedly "already working" on as early as May 2008 – is that Fahlbusch's (Old Navy's) representation was false.

34

"economically favorable" to it due to a decline in interest rates, "seiz[ing] on" other terms of the agreement "as a pretext for not going forward with" it at the eleventh hour). That Old Navy's "true purpose" was to avoid negotiating *at all* can be inferred from the fact that Old Navy informed L-7 (1) that it wished to postpone the signing of a license indefinitely, (2) that it could not make a commitment to *any* discussions, and, ultimately, (3) that it "could not follow through with the promised license," Compl. ¶ 55.

Moreover, L-7's Complaint and the exhibits attached thereto support the inference that Old Navy's purported reasons for withdrawing from negotiations – i.e., that minimum guaranteed royalties were "inconsistent with [Old Navy's] business plans and practices," Ex. 28 – were pretextual. As of December 3, 2008, minimum guaranteed royalties were not one of the four "essential issues" on which "differences [had] emerged in the parties' positions" according to Old Navy, Ex. 26 (describing "the timing of [the] launch" as the "most important[]" issue); and assuming the truth of L-7's uncontradicted documentary evidence, none of the points that had "yet to be resolved" after the January 29th conference call – including minimum guaranteed

35

royalties – "was left off as a deal breaker" to L-7, Ex. 28.

*Third*, L-7 plausibly alleged that Old Navy's January Proposal was designed to be "economically unfair" to L-7 so that L-7 would reject it, pointing to Old Navy's "reneging" on its offer when L-7 ultimately signaled – after several counteroffers – that it would accept the bulk of the January Proposal.  See L-7 12(c) Opp. at 23.  While the District Court concluded as a matter of law that L-7 did not "accept" Old Navy's January Proposal, we are inclined to see a fact question as to whether L-7 plausibly alleged that Old Navy's January Proposal was designed to elicit L-7's rejection. See Venture Assocs., 96 F.3d at 280 (business owner would be acting in bad faith if its purpose in demanding more than prospective buyer would pay "was to induce [prospective buyer] to back out of the deal").  Whether or not L-7 "rejected key terms of Old Navy's" January Proposal or "made a series of counter-demands" before attempting to resurrect it, 2010 WL 157494, at *9,[17] the well-pled fact remains

---

[17]    The District Court concluded that L-7's requests for minimum guaranteed royalties constituted "extraordinarily high demands" to which Old Navy's resistence was "not surprising," 2010 WL 157494, at *8.  But L-7 argues, and we are inclined to agree, that this factual determination was made without the benefit of discovery or expert testimony.

36

that, when L-7 finally acquiesced to Old Navy's insistence on no minimum guaranteed royalties and appeared willing to accept an offer substantially on Old Navy's terms, Old Navy balked.  In light of the (1) documentary evidence that Old Navy's first proposal for the Branded Line did not come until January of 2009, after the intervention of outside counsel; (2) allegations that Old Navy's sluggish negotiations from December 15, 2008 to February 6, 2009 were a "sham," Compl. ¶ 124; (3) documentary evidence that L-7 was slowly retreating from and ultimately abandoned its insistence on minimum guaranteed royalties, a supposed sticking point for Old Navy; and (4) allegations that, under new management and in a deteriorating retail environment, Old Navy had decided it did not want to close *any* deal with Oldham, the Complaint raised the plausible inference that Old Navy's January Proposal was designed to elicit L-7's rejection.  For all of these reasons, L-7 stated a claim for breach of contract for failure to negotiate in good faith.[18]

---

[18]    Because L-7's claim for breach of the implied covenant of good faith and fair dealing (Count IV) is based on the same facts as its claim for breach of contract, it should have been dismissed as redundant.  See Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002); Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) ("[B]reach of [the duty of good faith and fair dealing] is merely a breach of the

37

### D.  Count I: Wrongful Termination

L-7 stated a claim for declaratory judgment for all three prongs of Count I.  *First*, L-7 stated a claim for declaratory judgment that Old Navy failed to comply with the notice and cure provisions of the Agreement.  Before either party could terminate the Agreement, section 5 required (1) notice *of a material breach*, (2) 30 days' opportunity to cure, (3) failure to cure the material breach, and (4) notice *of termination*.  <u>See</u> Agreement § 5.  But Old Navy's Termination Letter provided only notice of termination – effective immediately – without providing L-7 with notice of its alleged breaches and 30 days' opportunity to cure.  Old Navy conceded as much in its motion for judgment on the pleadings.  <u>See</u> Old Navy's Memorandum of Law in Support of Motion for Judgment on the Pleadings at 23.  Therefore, this claim should have survived.

*Second*, for the same reasons, L-7's claim for declaratory judgment that the Termination letter did not effect a termination of the Agreement should have survived.

*Third*, L-7 stated a claim for declaratory judgment that Old Navy wrongfully terminated the Agreement.  Old Navy

---

underlying contract.").

notified L-7 that it had "materially breached the [Agreement] by [(1)] filing a lawsuit against Old Navy" and (2) by failing to satisfy certain unspecified performance obligations. Ex. 29. "[B]ringing suit to determine the meaning of an agreement is not a breach of that agreement absent some explicit contractual provision that the party will not bring suit." Prudential Equity Grp., LLC v. Ajamie, 538 F. Supp. 2d 605, 611-12 (S.D.N.Y. 2008). Moreover, as L-7 explained to the District Court, "none of the vague, unspecified issues mentioned in the Termination Letter had been previously raised with L-7. . . . To the contrary, Mr. Oldham had been repeatedly and widely praised by Gap and Old Navy executives and staff throughout his Old Navy tenure." L-7 App. Brief at 50 (citing multiple allegations in, and documentary evidence supporting, the Complaint). Old Navy made no argument, and pointed to no evidence, contradicting these well-pled facts. Therefore, accepting L-7's allegations as true and drawing every inference in its favor, L-7 plausibly alleged that it was in compliance with the Agreement, which was therefore wrongfully terminated.

The District Court dismissed Count I upon its determination that Old Navy had no duty to provide L-7 with

39

an opportunity to cure because such cure would have been futile. (Of course, if the alleged grounds for L-7's termination did not constitute breach or material breach, then it is irrelevant whether L-7 could have "cured.") Thus, the District Court concluded that Oldham was unlikely to have been able to "perform [his] duties after he sued Old Navy" and unlikely to have withdrawn his complaint if Old Navy had sent a notice of breach. But this appears to be speculative. That conclusion, and the conclusion that withdrawal of the complaint could not have "undone the harm caused by the *public* filing of a lawsuit against Old Navy," 2010 WL 157494, at *10 (emphasis added), rests on the public nature of the litigation. However, it is undisputed that both of L-7's complaints were filed under seal. For all of these reasons, Count I survives Old Navy's 12(c) motion as a matter of law.

**II. Motion to Amend the Judgment and Replead**

We generally review motions for reconsideration under an "abuse of discretion" standard. See Devlin v. Transp. Commc'n Int'l Union, 175 F.3d 121, 131-32 (2d Cir. 1999). However, a denial of leave to amend that is based on a legal interpretation, such as for futility, is reviewed de novo. See Gorman v. Consol. Edison Corp., 488 F.3d 586, 592 (2d

Cir. 2007); <u>Littlejohn v. Artuz</u>, 271 F.3d 360, 362 (2d Cir. 2001).

The District Court erred in denying L-7's motion for leave to replead its bad faith negotiation claim based on futility.[19]  However, in light of our finding that Count III stated a claim for relief, this error was harmless because that Count of L-7's April 17, 2009 Complaint is reinstated.

**CONCLUSION**

For the foregoing reasons, we affirm in part and vacate in part the District Court's judgment, and we remand for further proceedings; in so doing we reverse in part the order of the District Court that dismissed the Complaint and reinstate Count I and Count III (on the three bases discussed in this Opinion).

---

[19]  We affirm the District Court's denial of L-7's motion for leave to replead trade disparagement and fraud.