**L–7 DESIGNS, INC., Plaintiff,**

v.

**OLD NAVY, LLC, Defendant.**

**No. 09 Civ. 1432(DC).**

United States District Court,
S.D. New York.

Aug. 29, 2013.

Memorandum Denying Certification
Dec. 10, 2013.

Winston & Strawn LLP by Virginia R. Richard, Esq., Lori van Auken, Esq., Lana C. Marina, Esq., New York, NY, for Plaintiff L–7 Designs, Inc.[7]

Fross Zelnick Lehrman & Zissu, P.C. by James D. Weinberger, Esq., Anna Leipsic, Esq., New York, NY, and Durie Tangri LLP by Daralyn J. Durie, Esq., Joshua H. Lerner, Esq., Eugene Novikov, Esq., San Francisco, CA, for Defendant Old Navy, LLC.

## OPINION

CHIN, Circuit Judge.

In this case, plaintiff L–7 Designs, Inc. ("L–7") and defendant Old Navy, LLC ("Old Navy") entered into a Creative Services Agreement (the "CSA") whereby L–7 was to provide Old Navy with creative design services, including "input" on "creative positioning, creative vision and creative strategy." Old Navy moved for judgment on the pleadings. I granted the motion and dismissed the action. *L–7 Designs, Inc. v. Old Navy, LLC,* No. 09 Civ. 1432(DC), 2010 WL 157494 (S.D.N.Y. Jan. 21, 2010) (*"L–7 Designs I"*). On appeal, the Second Circuit affirmed in part and vacated in part, and remanded two claims

for further proceedings. *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419 (2d Cir.2011) (*"L–7 Designs II"*).

On remand, the parties completed discovery. Old Navy now moves for summary judgment on the remaining two claims. For the reasons that follow, the motion is granted in part and denied in part, as set forth below.

## BACKGROUND

### A. The Facts

On a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. The following facts are drawn from the deposition transcripts, affidavits, declarations, and exhibits submitted by the parties. Any conflicts in the evidence have been resolved in favor of L–7, the party opposing summary judgment.

### 1. The Parties

L–7's principal, Todd Oldham, is an artist, designer, and television personality. (Oldham Decl. ¶¶ 1–12). He formed L–7 in 1989 to manage his design services and intellectual property rights. (*Id.* ¶¶ 2–3). Over the years, Oldham and L–7 marketed merchandise under the brand "TODD OLDHAM." (Compl. ¶¶ 8, 9, 13). L–7 owns certain federal registrations for the mark "TODD OLDHAM." (*Id.* ¶ 19).

Old Navy, a subsidiary of Gap Inc., operates a chain of retail apparel stores, with more than a thousand stores throughout the United States and Canada. (*Id.* ¶ 20). In the spring of 2007, L–7 approached Old Navy to discuss the possibility of entering into a relationship with L–7, and Old Navy eventually agreed to engage the services of

---

7. Plaintiff was represented by Winston & Strawn LLP when the present motion was briefed. Thereafter, the firm moved for leave

to withdraw. I granted the request, and the case was taken over for plaintiff by Denise Savage of the Savage Law Group.

Oldham and L–7. (Oldham Decl. ¶¶ 14, 16–18).

### 2. *The CSA*

On September 21, 2007, Old Navy and L–7 entered into the CSA. (Weinberger Decl. Ex. 6).[1] The CSA provided that L–7 would perform certain "Services" and provide certain "Deliverables" for Old Navy, as set forth in a "Scope of Work" (the "SOW") attached to the CSA. (*Id.*, CSA ¶ 1).

Pursuant to the SOW, Oldham was to provide services for Old Navy as "Design Creative Director," and L–7 was to be paid an annual consulting fee for three years (running through September 30, 2010) as well as certain bonuses. (*Id.*, SOW ¶¶ 1–2). The CSA provided that the fees to be paid pursuant to the SOW covered all "Services and Deliverables" and "all ownership rights, assignments, licenses and transfers by [L–7] set forth herein." (*Id.*, CSA ¶ 2(a)). The CSA gave Old Navy, for example, the limited right to use the TODD OLDHAM marks in connection with the parties' "relationship" with each other. (*Id.*, CSA ¶ 3(c)). The CSA provided, however, that the fees were "not intended to cover payment for ownership rights, assignments, licenses and transfers related to the Todd Oldham branded line of products described in the SOW." (*Id.*, CSA ¶ 2(a)).

The CSA also established that the agreement would terminate after three years. (*Id.*, CSA ¶ 5). In addition, within the three-year term, the CSA provided that "either party may terminate this Agreement, effective immediately upon notice thereof, in the event of a material breach of this Agreement that remains uncured after thirty (30) days written no-

tice of the breach to the other party." (*Id.*).

### 3. *The Licensing Agreement and Related Negotiations*

Section 5 of the SOW was entitled "Todd Oldham Branded Line," and it provided as follows:

a. In September 2007, the parties will announce publicly that Todd Oldham/[L–7] shall be serving as Design Creative Director of Old Navy and that it is the intent of the parties to develop and launch a line of products that will bear TODD OLDHAM Marks to be sold exclusively at Old Navy stores at a future time.

b. [L–7] and Old Navy acknowledge and agree that the specific terms and conditions related to this proposed line of products bearing TODD OLDHAM Marks are to be negotiated and agreed upon by the parties in a separate agreement. The parties plan to enter into a separate agreement related to these products by October 1, 2008.

c. The parties agree that this separate agreement will contain at least the following: (1) royalty fees paid to [L–7] of 5% of Old Navy's retail sales for this particular line only (not all Old Navy products) and (2) agreement and final approval by both Old Navy and [L–7] as to the collections and products to be sold by Old Navy.

(*Id.*, SOW ¶ 5). By these provisions, the parties entered into a binding preliminary agreement, that is, "a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *L–7 Designs II*, 647 F.3d at 430 (quoting *Teachers*

---

1. By its terms, the CSA is governed by New York law. (Weinberger Decl. Ex. 6, CSA ¶ 14).

*Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987)).

On September 21, 2007, Old Navy issued a press release announcing that it was going to launch a "TODD OLDHAM" branded line of products. (Oldham Decl. Ex. 6). Thereafter, L–7 and Oldham performed their obligations under the CSA, and Old Navy executives gave positive feedback. (Oldham Decl. ¶¶ 31–32).

In April 2008, L–7 and Old Navy began negotiations to finalize the numerous open terms of the license agreement for the "TODD OLDHAM" branded line of merchandise, as required under Section 5 of the SOW. (*Id.* ¶¶ 24, 33; Vayness Decl. ¶ 16). On April 2, 2008, L–7 provided Old Navy with its standard form license agreement and a term sheet, which proposed: a three-year initial term; a general launch and distribution plan for the "TODD OLD-HAM" branded products; plans for subsequent expansion; the previously agreed upon royalty rate of 5%; and unspecified annual guaranteed minimum royalties. (Vayness Decl. ¶ 16, Ex. 7). Thereafter, representatives of L–7 and Old Navy communicated back and forth about the proposed licensing agreement. (*Id.* ¶¶ 17–20, 22, Exs. 8–15). On June 12, 2008, L–7 told Old Navy in an email that, although the parties had not yet finalized an agreement on a license, "things are proceeding in the right direction in connection with the branded line." (Van Auken Decl. Ex. 80).

By September 2008, however, in part because business had been weaker than expected, L–7 was aware that Old Navy wanted to postpone the deadline for reaching a licensing agreement. (Weinberger Decl. Ex. 33). At this point, five months after L–7's initial April 2 offer, Old Navy had not yet responded with a counterproposal in writing.

Then, on September 30, 2008, Old Navy advised L–7 in a telephone call for the first time that it wished to postpone the signing of a license for the "TODD OLDHAM" marks indefinitely. (Vayness Decl. ¶ 19, Ex. 14; Oldham Decl. ¶ 40). After L–7's further efforts to pursue a licensing agreement failed, on October 8, 2008, L–7 advised Old Navy that Old Navy was in material breach of the CSA by failing to negotiate in good faith and enter a licensing agreement. (Vayness Decl. Ex. 14). On November 10, 2008, outside counsel for L–7 "demand[ed] ... payment from Old Navy to [L–7] in the amount of $75 million, as compensation for lost royalties and reputational damage," as well as $4 million for fees due under the CSA for the second and third years of the agreement. (*Id.* ¶ 25, Ex. 17).

Notwithstanding the threat of a lawsuit, L–7 and Old Navy returned to the negotiating table. Additional communications were exchanged, and representatives of Old Navy and L–7 conferred several times in December 2008 and January 2009 "to work out the details of the license agreement." (*Id.* ¶¶ 27, 33, 36, 41–45). On January 8, 2009, Old Navy provided L–7 with a term sheet addressing all "open terms" in the license. (*Id.* ¶ 42, Ex. 24). Old Navy proposed a launch at 100 Old Navy stores; 89 product categories; a four-season commitment; a sales goal of $30 million; marketing support of $1 million; a one-year projected royalty of $1.5 million, and no minimum royalty guarantee. (*Id.* Ex. 24). The same day, L–7 responded that "100 stores will not work. [T]he 1 million in launch dollars will not be effective. [T]he one year commitment is too brief...." (Weinberger Decl. Ex. 45). After discussions back and forth, L–7 significantly lowered its requested minimum from $37.5 million over three years to $2.25 million over two years. (Vayness Decl. Ex. 23; Van Auken Decl. Ex. 117; Weinberger Decl. Ex. 52).

On February 2, 2009, Old Navy advised L–7 that "after the many weeks that we have devoted to explaining the scope and limitations of an arrangement that could be acceptable, we continue to be disappointed about where things stand. For reasons that we repeatedly have tried to make clear to you, we cannot agree to your proposed terms." (Vayness Decl. Ex. 26). L–7 responded as follows:

> on the 29th, you monika and i had our conference call during which you [Old Navy] explained your positions, i [L–7] explained ours, i responded openly to your concerns and as a result suggested further changes to our positions. we both agreed that we will ask our respective principals for their input on these points. i asked you if you wanted me to re-cap the conversation in an email and you said that it was not necessary and that you were all clear on everything. we left off with the understanding that we made very good progress and while we agreed on most of the points, certainly the important ones, there remained a few points which were yet to be resolved. none of these points was left off as a deal breaker, none of these points was presented by me as such. we agreed at the end of the conversation to talk again this week after we will have spoken with our principals. on the same day, I sent you an email outlining todd's input on the points we discussed. (see below)

(*Id.*). The email goes on to list items as to which L–7 contended there was agreement, items that it was "now prepared" to accept (including entirely forgoing a minimum royalty guarantee), two points that needed clarification ("personnel" and "development budget"), and one issue "to be agreed to," that is, ownership of "designs." (*Id.*).

### 4. *The Negotiations Fail*

On February 6, 2009, Old Navy advised L–7 that material "open issues" remained, and that, in light of the nature of the negotiations, Old Navy did not believe that a "collaborative partnership" could be established. (Weinberger Decl. Ex. 68).

On February 18, 2009, L–7 commenced this lawsuit against Old Navy.

Two days later, on February 20, 2009, counsel for Old Navy sent L–7 a letter terminating the CSA on the grounds that L–7 had "materially breached the [CSA] by filing a lawsuit against Old Navy, by failing to provide meaningful input on design processes and procedures, by failing to participate meaningfully in meetings with the Old Navy creative team and by otherwise failing to perform its obligations under the [CSA]." (Oldham Decl. Ex. 18).

## B. *Prior Proceedings*

The first amended complaint (the "Complaint") asserted five counts: Count I sought a declaratory judgment declaring that Old Navy wrongfully terminated the CSA; Count II alleged trade disparagement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), based on allegedly false and disparaging remarks that Old Navy made about Oldham to the press; Count III alleged breach of contract, contending that Old Navy failed to enter into a license agreement for the TODD OLDHAM marks and failed to negotiate the contract in good faith; Count IV alleged a breach of the implied duty of good faith and fair dealing, asserting that Old Navy failed to negotiate a licensing agreement in good faith; and Count V alleged fraud, contending that Old Navy deceived L–7 from April 2008 through February 2009 by "its repeated false representations that it would enter into a licensing agreement governing the sale of the TODD OLDHAM branded line." (Compl. ¶ 118). Old Navy an-

swered and asserted counterclaims for breach of contract, contending that L–7 and Oldham failed to meet their obligations under the CSA, and for a judgment declaring that Old Navy met its contractual obligations while L–7 did not.

I granted Old Navy's motion for judgment on the pleadings and dismissed all of L–7's claims; on appeal, the Second Circuit affirmed in part and vacated in part, reinstating Counts I and III. *See L–7 Designs II*, 647 F.3d 419. The Second Circuit concluded that L–7 had plausibly alleged that Old Navy had failed to negotiate in good faith. *Id.* at 431–34. It also held that my determination that " 'it is highly unlikely that L–7 would have withdrawn the complaint if Old Navy had sent it a notice to cure' ". was speculative, *L–7 Designs II*, 647 F.3d at 434–35 (quoting *L–7 Designs I*, 2010 WL 157494 at *10). The Court of Appeals also disagreed with my conclusion that withdrawal of the complaint " 'would not have undone the harm caused by the public filing of a lawsuit against Old Navy' " because L–7's two complaints were filed under seal. *L–7 Designs II*, 647 F.3d at 435 (quoting *L–7 Designs I*, 2010 WL 157494 at *10).

The parties had engaged in limited discovery before the appeal, *see id.* at 427, and on remand, they completed discovery. Old Navy moved for summary judgment. The proceedings were delayed when L–7's counsel moved for leave to withdraw and the parties engaged in, unsuccessfully, settlement negotiations. I now decide the motion.

## DISCUSSION

### A. Summary Judgment Standard

The standards governing motions for summary judgment are well settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment must be denied "if the evidence is such that a reasonable jury could return a verdict in favor" of the non-moving party. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178–79 (2d Cir.2008).

In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir.2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *W. World Ins. Co. v. Stack. Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (internal citation and quotation marks omitted).

The role of the Court on a motion for summary judgment is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because the Court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996); *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994).

### B. Failure To Negotiate in Good Faith

As the Second Circuit noted, section 5 of the SOW created a binding preliminary

agreement to negotiate the license agreement in good faith. *See L–7 Designs II,* 647 F.3d at 430. The parties agree, however, that Old Navy could abandon the deal as long as it first made a good faith effort to reach an agreement. (Def.'s Mot. for Summ. J. 15–16; Pl.'s Opp'n 20 (citing *L–7 Designs II,* 647 F.3d at 430–31)). L–7 contends that Old Navy breached the CSA and SOW "by failing to negotiate in good faith." (Compl. ¶ 106). Old Navy moves for summary judgment on this claim. For the reasons described below, with respect to the failure to negotiate claim, I grant Old Navy's motion for summary judgment.

### 1. *Applicable Law*

 Under New York law, "a binding preliminary agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987). With this sort of agreement, "the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement; if they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir. 1998). It is possible, then, that no contract will be finalized if, for example, the parties encounter "good faith differences in the negotiation of the open issues" or "lose interest as circumstances change." *Tribune Co.,* 670 F.Supp. at 498.

 In the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated. *See* 1 Arthur Linton Corbin, On Contracts § 2.8 (rev. ed. 1993). Some generalizations, however, can be drawn. First, at the very least, good faith requires "honesty in fact." 6 *id.* § 26.8; *cf. A.I. Trade Finance, Inc. v. Laminaciones de Lesaca, S.A.,* 41 F.3d 830, 837 (2d Cir.1994) (citing UCC, as adopted by New York). Negotiations conducted in good faith encompass an "honest[ ] articulation of interests, positions, or understandings." *Penguin Grp. (USA) Inc. v. Steinbeck,* No. 06 Civ. 2438(GBD), 2009 WL 857466, at *2 (S.D.N.Y. Mar. 31, 2009); *see also TVT Records v. Island Def Jam Music Grp.,* 244 F.Supp.2d 263, 277 (S.D.N.Y.2003) (" 'The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract.' " (quoting *Cross & Cross Props., Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989) (describing covenant of good faith and fair dealing))).

 Second, the duty to negotiate in good faith obligates a party only to *try* to reach an agreement; a party does not act in bad faith merely because, in the end, it refuses to capitulate to the other side's demands. *See Steinbeck,* 2009 WL 857466, at *2; 6 Corbin, *supra,* § 26.8 (citing Robert S. Summers, " 'Good Faith' in General Contract Law and the Sales Provisions of the Uniform Commercial Code," 54 Va. L.Rev. 195, 202–03 (1968)); *cf. Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671, 681 (2d Cir.1983) (with respect to duty to promote in good faith, finding of bad faith is inappropriate "unless the plaintiff proves that the motivation underlying those decisions was not a good faith business judgment").

 Third, "[s]elf-interest is not bad faith." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 96 F.3d 275, 279 (7th Cir.1996). Acting in one's financial self-interest, for example, in response to market changes, does not constitute bad faith. *Id.*

Fourth, bad faith requires some "deliberate misconduct"—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment. *See Venture Assocs.*, 96 F.3d at 279. For example, a party acts in bad faith if it " 'renounce[s] the deal, abandon[s] the negotiations, or insist[s] on conditions that do not conform to the preliminary agreement.' " *L–7 Designs II*, 647 F.3d at 430 (quoting *Tribune Co.*, 670 F.Supp. at 498). Thus, "trying to scuttle the deal" or to take advantage of expenditures made by the other side to advance the project may constitute bad faith, depending on the circumstances. *See Venture Assocs.*, 96 F.3d at 279–80 (raising price for asset sale to induce opposing party to reject deal distinguished from merely raising price in light of asset's increased market value), *cited with favor in L–7 Designs II*, 647 F.3d at 433. *See generally* E. Allan Farnsworth, "Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations," 87 Colum. L.Rev. 217, 273–85 (1987) (describing instances of unfair dealing during negotiation process by drawing comparisons to other bodies of law).

In the end, however, "[a] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." *Tribune Co.*, 670 F.Supp. at 497. Where negotiations fail for bona fide business reasons, the duty to negotiate in good faith should not operate to elevate a binding preliminary agreement into a full-blown contract. *See Venture Assocs.*, 96 F.3d at 281 (Cudahy, concurring) (acknowledging "paradox" of "foist[ing] the peculiar and special consequences of an agreement on parties who have not in fact agreed" in light of the "many perfectly legitimate reasons for negotiations to fail, even if good faith prevails").

## 2. *Application*

Based on the record as developed through discovery, I conclude that summary judgment is warranted on this claim. First, I conclude that a reasonable jury could only find that Old Navy had engaged in lengthy and meaningful negotiations with L–7. The evidence indisputably shows that Old Navy negotiated with L–7 on and off for approximately ten months, exchanging emails and phone calls with L–7 from early April 2008 until February 2009. (Vayness Decl. ¶¶ 16–47, Exs. 7–16, 18, 21, 23, 26). Indeed, L–7 acknowledged in July 2008 that the parties were making progress in the negotiations. (*See* Vayness Decl. Ex. 26 (after phone call between L–7 and Old Navy on January 29, 2009, parties "left off with the understanding that we made very good progress"), Ex. 9 (stating that L–7 was "looking forward . . . to finishing . . . negotiations regarding the branded line")).

In early September 2008, Old Navy requested postponing the October 1, 2008 target for entering into a licensing agreement. (Weinberger Decl. Ex. 30). Shortly thereafter, Old Navy informed L–7 that it would no longer be able to enter into a licensing agreement due to "the business challenges facing Old Navy." (Vayness Decl. Ex. 15). The parties, however, resumed negotiations in early December 2008. (*Id.* Ex. 21). Old Navy described this meeting as "productive" and involving "a positive exchange of views and ideas." (*Id.*). Moreover, Old Navy specifically assured L–7 in a December 9, 2008, email that it "remain[ed] prepared to continue discussions concerning the appropriate terms and approach for a future launch of a [Todd Oldham branded] line and would be open to continuing [the] discussions at [L–7's] convenience." (Vayness Decl. Ex. 21). It subsequently provided L–7 with a

written proposal on January 8, 2009. (Weinberger Decl. Ex. 40).

Although Old Navy may have been slow to fully respond to L–7's April 2008 proposal (*see* Pl.'s Opp'n 21–22), and negotiations certainly stopped and started, on this record, a jury could only conclude that Old Navy's negotiations with L–7 were repeated and ongoing. Indeed, L–7 was caught by "complete surprise" when the negotiations were terminated in February 2009—a strong indication that Old Navy had been participating actively and responsively. (Vayness Decl. Ex. 26 (L–7 "caught ... by complete surprise [given that previous phone call regarding the branded line] was completely amicable, polite, professional, [and] friendly")).

Second, a reasonable jury could only conclude that Old Navy's January 8, 2009 proposal was a legitimate and substantial offer. Old Navy offered L–7 an opportunity to launch the Todd Oldham branded line in 100 stores for four seasons, beginning in Spring 2010, with an initial marketing budget of approximately $1 million. (Weinberger Decl. Ex. 40). Old Navy would not hire additional personnel for the branded line, but its staff would be available to L–7, and L–7 would provide Old Navy with design proposals whose aesthetic would align with Old Navy's target customers. (*Id.*). And, in accordance with the SOW (Weinberger Decl. Ex. 5, SOW ¶ 5(c)), Old Navy offered a five percent royalty rate, which it predicted would generate approximately $1.5 million for L–7 over the course of the first year, although the proposal did not contemplate a minimum royalty guarantee (*id.*). A reasonable jury evaluating Old Navy's proposal, offering Oldham a significant market for his designs and L–7 an opportunity to earn in excess of $1.5 million on the merits of those designs, could only view this proposal as a legitimate offer.

Third, even assuming that, as L–7 asserts, Old Navy changed its mind about entering into a license agreement for the branded line, a reasonable jury could only find that the decision was motivated by Old Navy's legitimate business concerns. For one, the company's management changed significantly as Old Navy purged many of its senior employees. (*See, e.g.,* Van Auken Decl. Exs. 8, 59–61, 91; Weinberger Decl. Ex. 18). Moreover, in addition to the general economic malaise, Old Navy had experienced several years of poor sales. (Weinberger Decl. Ex. 19, at 227:18–21, 229:1–21; Vayness Decl. Ex. 16, Ex. 19 ¶ 23). Finally, between the time when Oldham first joined Old Navy and when the parties began to negotiate the licensing agreement for the branded line, Old Navy had re-assessed its target customer, moving from a young, cheeky, fashionista to "Jenny and Mike"—cost-conscious parents shopping for the family. (Weinberger Decl. Ex. 9 at 237:12–238:9; Van Auken Decl. Ex. 7, at 238:15–23; Van Auken Decl. Ex. 5, at 227:18–229:21). In light of its internal leadership tumult, the realities of its own financial performance (and that of the market generally from 2008 to 2009), and the course correction it made with respect to its target consumer, Old Navy was understandably reticent to commit to a new, untested product line. Furthermore, L–7 has presented no evidence to show that Old Navy acted with malice or ill will or for any reason other than its own financial self-interest. Hence, a reasonable jury could only find that independently, and certainly viewed in the aggregate, these legitimate business reasons were what prompted Old Navy to proceed with caution and prudence when negotiating with L–7. *Cf. Zilg,* 717 F.2d at 681 (publisher satisfied duty to promote with good faith when making decisions solely based on "good faith business judgment").

■ Nevertheless, L–7 makes several arguments to support its claim that Old Navy negotiated in bad faith. It first asserts that Old Navy made material misrepresentations by indicating that its legal team was reviewing the licensing agreement in May 2008 and by promising to follow up on L–7's initial proposal. L–7 contends that these misrepresentations were employed to avoid entering into the license agreement (*see* Am. Compl. ¶ 121) and presents some evidence that Old Navy wanted to hedge its bets.[2] But this evidence actually indicates that, while Old Navy was certainly assessing its options, Old Navy had made no clear decision on Oldham in mid–2008. (Van Auken Decl. Exs. 78–79 (Wyatt suggests "slow[ing] down" negotiations and "not pursuing the branded line"); *id.* Ex. 87 (acknowledging need to "keep [Oldham] engaged until we show a couple quarters of traction"); *id.* Ex. 7, 257:11–258:13 (acknowledging executives were considering a "Plan B" that included terminating Oldham's contract)). Indeed, the evidence shows that Old Navy was still considering the possibility of completing a deal with L–7, but first wanted to see how sales fared. Any financial impact due to Oldham's input during the creative process would have only been apparent beginning in August and September. (*See* Van Auken Decl. Ex. 8; *id.* Ex. 7, at 256:19–257:10). The sales, however, were ultimately deemed disappointing. (*See id.* Ex. 5, at 245:23–247:10).

It is hard to perceive how Old Navy's failure to disclose internal discussions regarding Oldham and the branded line *before* having made a final decision on those issues constituted a material misrepresentation. *Cf.* Farnsworth, *supra,* at 234 (party should be liable in tort if, "having lost [the] intent [to reach agreement], continues in negotiations or fails to give prompt notice of its change of mind" but noting law of misrepresentation rarely applied to failed negotiations). Moreover, once Old Navy learned that Oldham's creative input had no impact on its sales figures, it informed L–7 that it no longer wished to pursue the licensing agreement due to pressing "business challenges." (Vayness Decl. Ex. 15). In light of the foregoing, a reasonable jury could only find that Old Navy had not materially misrepresented its interest in reaching an agreement in mid–2008. *See Tribune Co.,* 670 F.Supp. at 497 ("mere participation in negotiations and discussions does not creating binding obligation" and courts should "avoid trapping parties in surprise contractual obligations").

■ Second, L–7's argument that Old Navy's January 2009 proposal was unreasonable and designed to elicit a rejection must fail. This assertion rests partly on the fact that Old Navy's proposal insisted on no minimum royalty guarantees even though early indications during negotia-

---

**2.** Beginning in May 2008, just one month after L–7 had submitted its first written proposal, senior Old Navy executives (including then-Old Navy acting president Tom Wyatt) had discussed "slow[ing] down" negotiations and "not pursuing the branded line." (Van Auken Decl. Exs. 78–79; *id.* Ex. 6, at 192–93, 276–79). Old Navy recognized, however, a need to "keep [Oldham] engaged until we show a couple quarters of traction." (*Id.* Ex. 87). In mid-June of 2008, while Old Navy was purportedly engaged in negotiations with L–7 with respect to the Todd Oldham branded

line, an email indicated that executives were ambivalent about Oldham's long-term future with Old Navy: "[Gap, Inc. president] Glenn [K. Murphy] shares our concern on the external message if we were to make a change [with Todd]. . . . And he strongly recommends we not make an[y] changes until we see the comps in August September which is his product. If acceptance is strong, we need to figure out how to keep him and fully utilize him. If it's not, we need to think about plan B." (Van Auken Decl. Ex. 8; *see also id.* Ex. 7, at 257:11–258:13).

tions had arguably suggested that this issue was not of significant importance to Old Navy. (Van Auken Decl. Ex. 78 (identifying need, during early discussions, to clarify with Oldham "new customer and brand strategy" and "gifting strategy and the apparel line under the branded name")). L–7 also presents evidence that, as late as December 3, 2008, Old Navy's outside counsel had not identified minimum royalty guarantees as an "essential issue[ ]" to be resolved. (*Id.* Ex. 20 (noting that "differences emerged in the parties' positions, including on such *essential issues* as the types of products to be included in the line, how many stores would be included in a launch, the staffing necessary to support such a line, and, most importantly, the timing of any such launch" (emphasis added))).

Negotiations, however, are an evolving process, and as parties resolve certain points, other points gain greater importance. Old Navy, understandably, would have wanted to ensure that Oldham was on board with Old Navy's creative vision and revised customer and product strategy before it discussed financial details premised on a mutual understanding of those goals. Similarly, a reasonable jury could only find that the amount of a minimum royalty guarantee—*i.e.*, the precise millions of dollars that a financially struggling retail company would be obliged to pay each

year—could only be a point of interest to Old Navy, even if it were not explicitly identified as such. Moreover, the evidence clearly indicates that Old Navy considered, and rejected, the extent of minimum royalty guarantees initially proposed by L–7. (Weinberger Decl. Ex. 15 (Old Navy notes reflect intent to "push back on minimum; he is already getting a minimum"); Ex. 17 ("Todd . . . had initially discussed fairly sizeable minimums which I [Doug Howe] would advise against.")).

Although L–7's arguments may have been sufficient to state a claim at the pleadings stage, with the benefit of a full record, it is now clear that the assertion that Old Navy's proposal was made in bad faith because it was "designed to be economically unfair to L–7 so that L–7 would reject it" has no merit.[3] *L–7 Designs II*, 647 F.3d at 433 (citing *Venture Assocs.*, 96 F.3d at 280).[4] Hence, a reasonable jury could only find, on the fuller record now before the Court, that, even assuming Old Navy had intended to offer a proposal that would be rejected by L–7, its decision was motivated by the legitimate business concerns facing the company, *see* Farnsworth, *supra*, at 282 (noting that it "may not . . . be a breach of an agreement to negotiate . . . to back out on the ground of an unexpected drop in [ ] earnings"), and not any malice or animosity toward L–7 or Oldham in particular, *see Venture Assocs.*, 96 F.3d

**3.** Further, describing Old Navy's proposal as "economically unfair" is undermined by L–7's desire to ultimately accept a similar proposal, as described below.

**4.** The Second Circuit relied on *Venture Associates Corp. v. Zenith Data Sys. Corp.* when concluding that a deal proposed so as to elicit a rejection from the other party was evidence of bad faith. *L–7 Designs II*, 647 F.3d at 433 (citing *Venture Assocs.*, 96 F.3d 275, 279–80 (7th Cir.1996)). The Seventh Circuit, however, also emphasized that a party's change in negotiating position that was prompted by evolving business circumstances—even if it

knew that the opposing party would no longer agree to a deal on those terms—was not evidence of bad faith. *See Venture Assocs.*, 96 F.3d at 279–80 ("[Defendant] was free to demand as high a price as it thought the market would bear, provided that it was not trying to scuttle the deal, or to take advantage of costs sunk by [plaintiff] in the negotiating process. The qualification is vital. If the market value of [the asset for sale] rose, say, to $25 million, [defendant] would not be acting in bad faith even if it knew that [plaintiff] would not go so high." (internal citation omitted)).

at 279 ("The agreement to negotiate does not contain the terms of the final agreement. Otherwise it would *be* the final agreement.").

■ Third, L–7 contends—erroneously—that evidence of Old Navy's bad faith is apparent in its refusal to honor the terms of its January 8, 2009 proposal. L–7 initially responded to Old Navy's offer with two counteroffers (Weinberger Decl. Exs. 45, 47, 51), thereby rejecting the January 8 offer. *See Jericho Grp. Ltd. v. Midtown Dev.*, 32 A.D.3d 294, 820 N.Y.S.2d 241, 246–47 (1st Dep't 2006) ("[I]t is a fundamental tenet of contract law that a counteroffer constitutes a rejection of an offer as a matter of law."). Of course, L–7 was not obliged to accept any proposal advanced by Old Navy; it was entitled to assess frankly the probability that the branded line would succeed, weigh the relative risks of pursuing the branded line without a minimum royalty guarantee or proceeding solely on the merits of Oldham's contributions to the branded line, and, if it so desired, attempt to negotiate terms more favorable.

Old Navy, too, was under no obligation to cede to L–7's demands, but was entitled to make measured decisions in its own business interest. *See Steinbeck*, 2009 WL 857466, at *2 ("The linchpin of negotiation is not that one side capitulates to the other, but that there is a good faith, honest, articulation of interests, positions, or understandings."). In addition, to the extent that L–7's counterproposals bridged some of the distance between the parties' respective positions, it did not follow that, merely by failing to fully close the gap, Old

Navy acted in bad faith. *Cf. Zilg*, 717 F.2d at 681 (publisher satisfied duty to act in good faith when making decisions based on "good faith business judgment").

Furthermore, Old Navy's January 8, 2009 proposal was not a commitment or even a tentative agreement, and Old Navy had a good reason to withdraw that proposal. Although L–7 eventually agreed to most of the terms, it did not do so until several weeks later. (Weinberger Decl. Ex. 53 (on February 2, 2009, L–7 agrees to terms in substance as described in Old Navy's proposal and suggests that Old Navy propose new language for particular provisions if L–7's language is not amenable)). Old Navy was not obliged to hold its offer (which had already been rejected—twice) open in perpetuity. That the parties failed to reach an agreement here is not, as a matter of law, grounds for concluding that Old Navy's negotiations were not in good faith. *See Adjustrite*, 145 F.3d at 548.

■ Finally, L–7 also asserts that Doug Howe, then an executive vice president with Old Navy, after consulting with counsel, had told L–7 that Old Navy could fulfill its obligation to negotiate in good faith merely by proposing intentionally undesirable terms to L–7. The only evidence it presented of this allegation was a declaration by an agent of L–7 and an email from L–7 disagreeing with the statement allegedly made.[5] Even assuming that Howe made this statement, amidst the wealth of evidence that Old Navy negotiated in good faith, a single offhand remark is insufficient to raise a triable question of

---

5. *See* Vayness Decl. ¶ 20 (recounting conversation); *id.* at Ex. 14 (Vayness reporting that L–7 "would consider [Old Navy's] attorney's point of view that old navy could therefore deliberately (so as to appear as if it were fulfilling its obligation to launch the line) make the collection small and consequently insignificant in its scope (or in any other manner propose terms which cannot be reasonably acceptable to us), to be in bad faith."). *But see* Weinberger Decl. Ex. 20, at 274 (Howe testifies at deposition that he "[couldn't] imagine saying that").

material fact. Furthermore, to the extent L–7 points to an email by Old Navy's counsel indicating that Old Navy was not obliged to continue negotiating a licensing agreement for the branded line (Vayness Decl. Ex. 15 (describing the CSA as providing "only for an agreement to agree to a future separate license agreement" and, while open to discussing the branded line "in the future if business conditions permit, we are not currently in a position to make a commitment to any such future discussions")), that legal advice did not stop Old Navy from returning to the negotiating table. If anything, this evidence establishes Old Navy's good faith: it continued to negotiate even though it was told by counsel (right or wrong) that it was under no obligation to do so.

For the foregoing reasons, and because none of L–7's arguments creates a material question of fact, I conclude that, as a matter of law, Old Navy did not violate its duty to negotiate in good faith. Old Navy's motion for summary judgment is therefore granted with respect to this claim.

### C. *Wrongful Termination*

As described above, I had previously dismissed L–7's claim of wrongful termination of the CSA on Old Navy's motion for judgment on the pleadings. *See L–7 Designs I*, 2010 WL 157494 at *10. On appeal, the Second Circuit reversed, finding that L–7 had sufficiently stated a claim that Old Navy (1) had violated the notice-and-cure provision of the CSA and therefore its termination letter did not operate to terminate the CSA, and (2) had wrongfully sought to terminate the CSA. *See L–7 Designs II*, 647 F.3d at 434–35. On remand, the parties completed discovery. In light of the totality of evidence presented, I deny Old Navy's motion for summary judgment as to the wrongful termination claim, except to the extent set forth below.

### 1. *Materiality of L–7's Breach of the CSA*

Section 5 of the CSA states that, while the CSA was in effect, "either party may terminate this [CSA], effective immediately upon notice thereof in the event of a material breach of this [CSA] that remains uncured after thirty (30) days, written notice of the breach to the other party." (Weinberger Decl. Ex. 6, ¶ 5). Hence, except at the conclusion of the three-year term of the CSA, the CSA only permitted the parties to terminate the agreement in the event of a material breach.

On February 20, 2009, Old Navy sought to terminate the CSA, asserting that L–7 had materially breached the CSA by filing a lawsuit against Old Navy and by failing to perform its obligations under the CSA. (Oldham Decl. Ex. 18). L–7 contends that the breaches alleged were not material and, therefore, Old Navy's attempt to terminate the CSA was wrongful.

Under the CSA, Oldham was supposed to "[m]otivate, inspire, coach, and share vision, insight and passion with Old Navy's creative team." (CSA § 1). Thus, Oldham was contractually required to provide Old Navy with input on creative matters and strategy, and to advise Old Navy's leadership team. Although the complaints were filed under seal, Old Navy was, of course, aware of the allegations, and the pleadings were sure to (and did) become public. It is difficult to imagine, under these circumstances, that Oldham could meaningfully perform his duties under the CSA after he had sued Old Navy and had accused it and its executives of bad faith, fraud, and deceit.

Nevertheless, L–7 has presented evidence that it still could have had a pro-

ductive relationship with Old Navy. It is undisputed that, notwithstanding prior obstacles to a constructive working relationship, the parties were able to continue working side by side. For example, when L–7 accused Old Navy of bad faith in October 2008 and then brought in outside counsel to demand $75 million in "compensation" plus an additional $4 million in fees, Oldham continued to consult for Old Navy. Moreover, although Old Navy and L–7 had put negotiations for the licensing agreement on hold, they thereafter returned to the negotiating table, and tried to reach an agreement before discussions broke down for good in February 2009.

Moreover, Old Navy executives and staff widely praised Oldham during the course of their relationship. *See L–7 Designs II,* 647 F.3d at 434; *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.,* 765 F.Supp.2d 403, 417 (S.D.N.Y.2011) (SAS) (noting that "a number of statements indicating that [defendant] appreciated [plaintiff's] efforts and enjoyed working with [plaintiff]" undermined any argument that defendant had "terminated the business relationship as a result of good faith differences in business philosophies"). (*See also* Van Auken Decl. Ex. 94 (email from Murphy to Oldham referencing "our new product flow, that you brought to life"); Oldham Decl. Ex. 12 (collecting various emails complimentary to Oldham dated from October 27, 2008 to January 13, 2009 from various Old Navy executives and employees)).

In light of the foregoing, and after construing the evidence in the light most favorable to L–7, I conclude that L–7 has identified material questions of fact as to whether Oldham materially violated his obligations under the CSA and whether filing a lawsuit materially undermined Oldham's ability to satisfy his obligations to Old Navy under the CSA. *See, e.g., Frank*

*Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997) ("Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." (internal quotation marks omitted)). It is possible that a reasonable juror could find that L–7's filing of the complaint constituted a breach of the CSA by preventing adequate collaboration between Oldham and the Old Navy executives with whom he was to work. It is likewise possible, however, that a reasonable juror could find that L–7's lawsuit was merely an attempt to clarify the meaning of the CSA. *See Prudential Equity Grp., LLC v. Ajamie,* 538 F.Supp.2d 605, 611–12 (S.D.N.Y.2008) ("[B]ringing suit to determine the meaning of an agreement is not a breach of that agreement absent some explicit contractual provision that the party will not bring suit."). Hence, L–7 has identified material questions of fact as to whether it materially breached the CSA. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (summary judgment not warranted where "fair-minded jury could return a verdict for the plaintiff on the evidence presented").

## 2. *Notice and Opportunity To Cure*

Under Section 5 of the CSA, assuming a party materially breached the CSA, termination would be effective if the breach remained "uncured after thirty (30) days written notice of the breach to the other party." (Weinberger Decl. Ex. 6, CSA ¶ 5). Old Navy provided written notice of termination, in the form of its letter from outside counsel dated February 20, 2009 (Oldham Decl. Ex. 18), but it did not first provide L–7 with thirty days to cure the alleged material breaches.

Old Navy contends that, even if a jury would conclude that L–7 had materially breached the CSA, it was relieved of the obligation to provide a cure period because

any such notice would have been futile. *See Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991) (holding party not required to adhere to contractual provision requiring cure period if doing so would be futile); *Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 60 A.D.2d 568, 399 N.Y.S.2d 700, 701 (2d Dep't 1977) (when one party "will not live up to the contract, the aggrieved party is relieved from the performance of futile acts"). I agree.

As described above, the undisputed evidence establishes the following: The parties engaged in prolonged, detailed, and difficult negotiations over the terms of the licensing agreement. The parties were unable to come to an agreement. L–7 then sued Old Navy in February 2009, alleging that Old Navy had acted in bad faith and accusing the very executives he was supposed to advise of fraud and deceit. L–7 hired a major law firm to file suit in federal court, setting forth detailed allegations in a complaint appended with hundreds of pages of exhibits. In light of the foregoing, it is hard to imagine that L–7 would have withdrawn its complaint merely because Old Navy asked it to do so.

Furthermore, L–7 has presented *no* evidence that, provided proper notice, it would have withdrawn the complaint. Oldham testified that he did not know whether he would have withdrawn the complaint "[i]f Old Navy had asked [him] to ... as being a breach of the creative services agreement." (Weinberger Decl. Ex. 9 at 303:7–11). Moreover, when Old Navy asked Oldham "[w]hat factors might have led [him] to withdraw the complaint" had it so requested, Oldham's counsel objected and instructed Oldham not to answer on the grounds that those issues were speculative and "no longer before the

court." (*Id.* at 303:15–304:15).[6] Thus, the record provides no support for the assertion that L–7 would have withdrawn the complaint, and L–7 would not be permitted at trial to offer evidence for the first time that it would have done so. *See Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43–44 (2d Cir.2000) (testimony contradicting party's deposition inadmissible at hearing absent new evidence); *cf. Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997) (" '[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.' " (quotation omitted)). While, on the pleadings alone, it might have been speculative to conclude that L–7 would not have withdrawn its complaint, *see L–7 Designs II*, 647 F.3d at 434–35, under the record as developed through discovery, only the unsupported assertion that L–7 would have withdrawn its complaint can be deemed speculative.

Thus, there is no evidence to suggest that L–7 would have cured the alleged material breaches as required under the contract. I hold, therefore, that as a matter of law, Old Navy was excused from its obligation to give notice and an opportunity to cure and its failure to provide such notice, as a matter of law, did not constitute a breach of the CSA. *See Wolff & Munier, Inc.*, 946 F.2d at 1009 (excusing compliance with contract provision if "strict adherence" to that provision would have been "useless act").

Nevertheless, the fact remains that, unless L–7 materially breached the CSA, Old Navy's termination of the CSA would have been wrongful. Because, as discussed above, L–7 has raised material questions of fact as to whether it had breached the CSA, Old Navy's motion for summary

---

**6.** Old Navy did not file a motion to compel this testimony.

judgment on the wrongful termination claim is denied. I hold as a matter of law, however, that assuming Old Navy had sufficient grounds to terminate the CSA, its failure to provide L–7 with an opportunity to cure will be excused.

### D. *Damages*

■■■■■ Old Navy argues that it is entitled to summary judgment on the amount of damages because L–7 failed to substantiate its claim for damages. For example, Old Navy alleges that L–7 failed to cooperate during discovery and refused to provide tax returns and other information that would bear on its damages. (Def. Mem. in Supp. at 23–25). In opposition, L–7 argues that it detailed its damages in its responses to interrogatories and other discovery requests, but it does not deny that it refused to answer certain of Old Navy's requests for discovery regarding purportedly lost income. (*See* Pl. Mem. in Opp. at 19–20). Moreover, it asserts that its damages figures are undisputed and that, in any case, it was under no duty to mitigate damages because it was an independent contractor (rather than an employee). (*See id.*).

L–7's response is inadequate. First, in breach of contract cases generally, the duty of the injured party to mitigate its damages is well established. *See, e.g., Drummond v. Morgan Stanley & Co.,* No. 95 Civ.2011(DC), 1996 WL 631723, at *2 (S.D.N.Y. Oct. 31, 1996) ("It is well settled that a plaintiff who suffers injury as the result of a breach of contract is under a duty to mitigate damages; if he or she fails to do so, any award of damages will be reduced 'by any unnecessary increase in damages due to the failure of the plaintiff to avoid them.' " (quoting *U.S. W. Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.,* 810 F.Supp. 1393, 1402 (S.D.N.Y.1993))); *Holy Props. v. Cole*

*Prods.,* 87 N.Y.2d 130, 133, 637 N.Y.S.2d 964, 661 N.E.2d 694 (1995) ("The law imposes upon a party subjected to injury from breach of contract, the duty of making reasonable exertions to minimize the injury."). This rule applies even where the injured party is not an employee but a contractor. *See, e.g., Donald Rubin, Inc. v. Schwartz,* 191 A.D.2d 171, 594 N.Y.S.2d 193 (1st Dep't 1993) (where contractor was relieved of his obligation to perform services, he was required to produce "tax returns and other information pertinent to mitigation of damages"); 22 Am.Jur.2d, *Damages* § 34 at 57 ("gains which were or could have been received by the nondefaulting party by entering into another contract or transaction should be used in reducing damages caused by a breach of contract promise only where the breach gave rise to an opportunity to enter into those other contracts or transactions"). Thus, L–7 clearly had a duty mitigate its damages.

Second, L–7 had a duty to produce documents and other documents relating to its claim of lost income and other damages (as well as discovery related to its efforts to mitigate those damages). It cannot simply say, for example, in responses to interrogatories, that these are our damages. Old Navy was entitled to test the calculations, to probe L–7's assertions, and to insist on back-up and proof. *Readex Microprint Corp. v. General Aniline & Film Corp.,* 74 N.Y.S.2d 613, 618 (1947) ("A plaintiff seeking compensatory damages has the burden of proof and should present to the court a proper basis for ascertaining the damages he seeks to recover. They must be susceptible of ascertainment in some manner other than by mere conjecture or guesswork."). Old Navy did not, however, move to compel L–7 to provide discovery, and the discovery deadline has long passed.

In light of the foregoing, although L–7 may present evidence of damages at trial, it may *only* offer proof of damages that it has previously produced in discovery. Of course, Old Navy has the right to object to the admissibility of any such evidence.

## CONCLUSION

For the reasons set forth above, Old Navy's motion for summary judgment is granted in part and denied in part. The Court will hold a status conference on September 11, 2013, at 11:00 a.m.

SO ORDERED.

## MEMORANDUM DECISION

In an August 29, 2013, opinion, I granted in part and denied in part the motion of defendant Old Navy LLC ("Old Navy") for summary judgment. 964 F.Supp.2d 299. The opinion (1) granted summary judgment in favor of Old Navy on the claim by plaintiff L–7 Designs, Inc. ("L–7") that Old Navy failed to negotiate in good faith (Count III), *id.* at 306–13; (2) denied summary judgment on L–7's wrongful termination claim (Count I), but excused Old Navy's failure to provide notice and an opportunity to cure on the ground of futility, *id.* at 312–15; and (3) limited L–7's proof of damages to evidence it produced in discovery, *id.* at 314–17. On October 1, 2013, I denied L–7's motion for reconsideration.

L–7 moves for entry of final judgment under Fed.R.Civ.P. 54(b) on Count III— *i.e.*, the good faith negotiation claim—so that it may take an interlocutory appeal. In the alternative, it moves for certification of the order as appealable under 28 U.S.C. § 1292(b). It also seeks a stay of proceedings pending appeal. For the reasons set forth below, L–7's motion is denied.

## DISCUSSION

### I. *Applicable Law*

#### A. *Rule 54(b)*

Rule 54(b) "provides an exception to the general principle that a final judgment is proper only after the rights and liabilities of all the parties to the action have been adjudicated." *Hogan v. Consol. Rail Corp.,* 961 F.2d 1021, 1024–25 (2d Cir. 1992). The Rule provides, in relevant part, that "[w]hen an action presents more than one claim for relief ..., the court may direct entry of a final judgment as to one or more, but fewer than all, claims ... only if the court expressly determines that there is no just reason for delay." Fed. R.Civ.P. 54(b). Thus, the Rule requires: "(1) multiple claims ... must be present, (2) at least one claim ... must be finally decided within the meaning of 28 U.S.C. § 1291, and (3) the district court must make 'an express determination that there is no just reason for delay' and expressly direct the clerk to enter judgment." *Ginett v. Computer Task Grp., Inc.,* 962 F.2d 1085, 1091 (2d Cir.1992) (emphasis removed).

In deciding whether there is "just reason for delay," a court must determine whether immediate appeal would be "in the interest of sound judicial administration." *Id.* at 1092 (quotation omitted). The exercise of this discretion is guided by considerations such as the institutional efficiency of the district and appellate courts, as well as any "undue hardship" that the parties may have to suffer absent an immediate appeal. *Curtiss–Wright Corp. v. Gen. Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 16 (2d Cir.1997). Importantly, Rule 54(b) is to be invoked "sparingly," *Hogan,* 961 F.2d at 1025, as "federal policy

generally disfavors 'piecemeal' appellate litigation," *Ginett*, 962 F.2d at 1093.

### B. *Section 1292(b)*

Section 1292(b) provides that a district court has the discretion to certify an order for immediate appeal upon finding that "such order involves a controlling question of law as to which there is substantial ground for difference of opinion· and that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." 28 U.S.C. § 1292(b); *accord Mills v. Everest Reinsurance Co.*, 771 F.Supp.2d 270, 273 (S.D.N.Y.2009).

 Like Rule 54(b), § 1292(b) provides "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir.1996). Thus, § 1292(b) is reserved for the narrow band of "extraordinary cases where appellate review might avoid protracted and expensive litigation." *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F.Supp. 1385, 1398 (S.D.N.Y.1995).

### C. *Stay Pending Appeal*

 A district court may enter a stay pending appeal upon considering four well-established factors: ·"the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is issued, and the public interest." *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir.2002). Additionally, "[a] stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (citations, quotations, and alterations omitted).

## II. *Application*

### A. *Rule 54(b)*

 L–7 has asserted "multiple claims" and at least one of those claims has been "finally decided." L–7 has failed to show, however, "no just reason for delay" or that immediate appeal would be in the interest of sound judicial administration.

First, the case is almost five years old, discovery was completed long ago, and Old Navy's dispositive motion has been decided.

Second, the case is ready for trial, and trial is set for January 21, 2014. The parties have estimated that the trial will take only one week or so. The parties were given the January 21st date weeks ago, and they should be ready to proceed in January.

Third, while there is a chance, as L–7 argues, that proceeding with trial now could result in two trials if my summary judgment decision is reversed on appeal, of course a second trial will not be required if my summary judgment decision is upheld. At the same time, if I were to grant L–7's motion, there is a possibility of two appeals—an appeal now, a trial following the first appeal, and then a second appeal following the trial. There is a risk of duplication either way, but doing it L–7's way will likely delay the final resolution of the case.

Fourth, L–7 has simply not shown good reason to delay trial and allow an interlocutory appeal. L–7 has failed, for instance, to present any argument for why it would suffer unique "hardship or injustice" absent an immediate appeal. And none is apparent. A one-week trial in January will not cause L–7 hardship or injustice.

Accordingly, there is no reason to disregard the general policy against piecemeal appellate litigation, and L–7's Rule 54(b)

motion to direct entry of final judgment is denied.

### B. *Section 1292(b)*

█ L–7's arguments for certification of an interlocutory appeal under § 1292(b) are similarly unpersuasive.

L–7 argues that the following issues amount to controlling questions of law on which there is substantial ground for difference of opinion: (1) "whether there is a material question issue [sic] of fact when construing the facts in the most favorable light to L–7, who was the answering party on the Old Navy SJ Motion" (L–7 Mem. in Supp. of Mot. at 10); (2) "why this Court did not find that Old Navy was in breach of the CSA when it failed to engage in good faith negotiations and enter into an agreement on or before October 8, 2009" (*id.*); (3) "[t]he Court's determination that Old Navy was excused from providing notice and opportunity for cure in the face of the Second Circuit's recitation of the evidence" (*id.* at 12); (4) whether "L–7 had a duty to mitigate its damages" (*id.*); and (5) "whether the filing of this Action by L–7 violated the CSA by preventing adequate collaboration," (*id.* at 13). None of these provides a sound basis for § 1292(b) certification.

First, for the reasons discussed above, an immediate appeal will not "materially advance the ultimate termination of the litigation." An immediate appeal would not terminate the action as to Count I, and I would have to try Count I at some point, in any event. Again, I do not believe it makes sense to adjourn the one-week trial scheduled for January indefinitely to permit L–7 to appeal one aspect of the case now. *See In re Duplan Corp.,* 591 F.2d 139, 148 n. 11 (2d Cir.1978).

Second, none of the issues L–7 identifies is a controlling question of law as to which there is "substantial ground for difference of opinion." L–7 largely repeats the arguments it made in opposing summary judgment and moving for reconsideration. For the reasons articulated in the August 29, 2013, opinion and the order denying the motion for reconsideration, I conclude that there is no substantial ground for disagreement on these issues, with one possible exception, and this possible exception is surely not controlling.

L–7 points to *Donald Rubin, Inc. v. Schwartz,* 191 A.D.2d 171, 594 N.Y.S.2d 193 (1st Dep't 1993), and *Rebh v. Lake George Ventures Inc.,* 241 A.D.2d 801, 660 N.Y.S.2d 901 (3rd Dep't 1997), to support its argument that it does not have any obligation to mitigate damages here. L–7 maintains that, because its contract with L–7 was nonexclusive, it could have provided similar services to others at the same time that it was providing contractually mandated services to Old Navy. Hence, it contends that it was under no duty to mitigate damages.[1]

Even assuming there is an exception for non-exclusive contracts to the general rule requiring mitigation of damages, it does not excuse L–7 from producing the damages-related evidence that Old Navy sought. This is so because the non-exclusive contract exception, to the extent that it exists, applies only where a party that has been injured by a breach of contract could have provided similar services to others at the same time. *See Donald Rubin, Inc.,* 594 N.Y.S.2d at 194 (" '[If] the injured party could and would have entered into the subsequent contract, even if the [original] contract had not been broken, and could have had the benefit of both, he … can be said to have lost volume and the subsequent transaction is not a substitute for the broken contract.' " (citing Restatement [Second] of Contracts

---

1. L–7 did not raise this argument in its brief opposing summary judgment.

§ 347, cmt. F)). Consequently, Old Navy was entitled to discovery on damages; L–7 still had to produce discovery relevant to the question of whether it could have provided and did provide services to others. Hence, to the extent that L–7 failed to fully cooperate during discovery, there was good reason to limit L–7's proof of damages to evidence that it had previously produced in discovery.

### C. Stay Pending Appeal

Nor has L–7 shown a basis for a stay pending appeal. L–7 has fallen far short of showing irreparable injury absent a stay. The cost-of-trial argument for irreparable injury that L–7 advances has been repeatedly rejected in other cases. *See, e.g., AVCO Fin. Corp. v. Commodity Futures Trading Comm'n*, 929 F.Supp. 714, 719 (S.D.N.Y.1996) ("[M]ere litigation expense, even if it is substantial, does not constitute 'irreparable injury'" (citing *Citadel Trading Co., Ltd. v. Bagely*, 440 F.Supp. 925, 927 (E.D.Mo.1977))); *Hayden v. New York Stock Exch., Inc.*, 4 F.Supp.2d 335, 340 (S.D.N.Y.1998) ("[A]ny injury arising from ... the delay and cost of litigation [is] legally insufficient to establish irreparable harm."). Nor has L–7 shown a likelihood of success on the merits of an appeal, nor has it shown that a stay is in the public interest. At the same time, Old Navy opposes a stay, and given the amount of time the case has been pending, Old Navy would be prejudiced if the trial were further delayed for an interlocutory appeal. A stay is unwarranted.

### CONCLUSION

For the foregoing reasons, L–7's motion is denied in its entirety.

SO ORDERED.